TATE, Judge.
This is a workmen’s compensation suit brought on behalf of an injured minor (“Monroe”)[1] against (a) his employer (“Malcolm”)[2] and (b) the insurer (“Southern Casualty”)[3] of his employer’s alleged principal (“Forest Products”)[4] in a principal-subcontractor relationship. From an award of compensation for fifteen months’ disability, the two defendants appeal, the employer Malcolm also appealing from the dismissal of a third-party demand by him against his alleged principal, Forest Products, and the principal’s insurer. The plaintiff answers the appeal to pray for a greater award.
The principal issue on appeal is: Was there a buyer-seller or instead a principal-subcontractor relationship between Malcolm and Forest Products, to which firm Monroe’s employer Malcolm delivered pulpwood produced by his crews? Additional issues concern (a) whether Forest Products and Southern Casualty are estopped to deny compensation coverage and (b) the duration of the injured workman’s disability.
1. General factual background.
The uncontradicted testimony shows as follows:
Malcolm was a one-truck pulpwood “producer”, sometimes denoted also as a “con *163 tractor” or “hauler”. He cut and delivered pulpwood, employing his own equipment and a crew of three to four men. Forest Products was a “broker” or “dealer” for International Paper Company, one of four in the parish (county). Each week International Paper gave Forest Products “wood orders” or “quotas” of pulpwood to be delivered during the following week to the two International Paper plants in the area.
Forest Products, a corporation principally owned by its president (“George”)[5] procured the pulpwood to fill its weekly International Paper wood order by allotting in advance each week a portion of this quota to each of some ten producers or haulers such as Malcolm. These producers then cut and delivered to the International Paper plants the amount and type of pulpwood per the weekly allotment previously received by them from Forest Products. International Paper does not accept any delivery of pulpwood from a hauler unless a broker (such as Forest Products) with a previous quota from International Paper has made prior arrangements with International Paper for the hauler to deliver pulpwood on such broker’s quota.
Forest Products obtained timber “produced” into pulpwood by these haulers in two manners: A. Forest Products itself through its president George purchased timber on various tracts, which George would then process into pulpwood with his own equipment or else assign his timber rights to an individual hauler for the latter to cut and deliver to International Paper the pulpwood from the tract; B. His producers themselves purchased the timber from landowners directly, and with their own crews and equipment processed such into pulpwood for delivery to International Paper pursuant to the portion of Forest Products’s wood-order allotted by it to such hauler.
2. General legal background.
In the former or A type of situation, where the dealer or broker himself purchases the timber and then secures pulpwood producers or haulers to cut and haul the lumber products, the dealer is ordinarily held liable for compensation benefits to the producer’s injured employees. In this situation, the dealer is regarded as a principal or employer using the producers as his subcontractors or employees to process his own standing timber for delivery and sale to the ultimate purchaser. Stevens v. Mitchell, 234 La. 977, 102 So.2d 237; Jones v. Hennessey, 232 La. 786, 95 So.2d 312; Kline v. C. W. Dawson, 230 La. 901, 89 So.2d 385; Townsend v. International Paper Co., La. App. 3 Cir., 166 So.2d 558; Redding v. Cade, La.App. 3 Cir., 158 So.2d 880.
 On the other hand, in the latter or B type of situation, where a producer or hauler has himself acquired the timber from a landowner and then uses his own equipment and employees to process it for delivery to fill a broker’s wood-order, the relationship between the producer and the broker is (in the absence of the broker’s or dealer’s right to control the economic activities of the producer) regarded ordinarily as that of seller and purchaser. This being so, the broker is not liable for compensation to the employees of the producer, since a buyer is not liable for workmen’s compensation benefits for accidental injuries sustained by employees of the seller. Hadnot v. Southern Casualty Ins. Co., La. App. 3 Cir., 166 So.2d 15; Richardson v. Jones, La.App. 3 Cir., 163 So.2d 119; Bryant v. United States Fidelity & Guaranty Co., La.App. 3 Cir., 163 So.2d 95; Garner v. Southern Pulpwood Ins. Co., La. App. 3 Cir., 149 So.2d 157.
Relying upon the latter line of decisions, counsel for Forest Products and Southern Casualty urges that neither Forest Products nor its insurer can be liable for workmen’s compensation under the present facts. *164 Monroe was admittedly injured while working on a tract of timber which his employer Malcolm had personally purchased from the landowner for his own account.
Malcolm’s counsel argues persuasively that various control features are indicative of a principal-subcontractor relationship even though the timber was purchased directly from the landowner by the producer. Nevertheless, under the cited Bryant case, a majority of this court has found these do not constitute such economic control as to convert the relationship between the producers and tire brokers into that of principal-subcontractor rather than that of buyer-seller.[6]
The trial court held, however, that at the time of Monroe’s accident Malcolm was still a subcontractor of Forest Products in continuation of such a relationship previously entered into when Malcolm was working on Forest Products’s own timber. In reaching this conclusion, our trial brother relied upon Vinzant v. L. L. Brewton Pulpwood Co., 239 La. 95, 118 So.2d 117. We will discuss this decision after first discussing the particular facts which bring into question its application.
3. Malcolm’s operations to produce pulpwood for Forest Products.
At the time of the accident Monroe, the injured workman, had been employed by Malcolm as a pulpwood cutter for about three weeks. Malcolm’s crew was then processing timber on the Sanders tract. Malcolm had purchased that tract’s timber directly from the landowner.
At the time of the accident on July 26, 1962, Malcolm had been “producing” pulpwood exclusively for Forest Products for some six or seven weeks. Prior to that, or up until June 6, 1962, Malcolm had been producing pine pulpwood exclusively for T. B. Godfrey, Inc., another broker. The God-frey firm then terminated arrangements with him, following which Malcolm and his crew were unemployed for about a week to ten days. Tr. 458.
He then contacted George, the president and principal owner of Forest Products, near George’s business place in Many. Although the respective versions of the subsequent agreement differ widely, it is certain that on that same Thursday afternoon, immediately after Malcolm and George talked, Malcolm and his crew did go out to the “Duggan” tract (s) and cut hardwood timber into pulpwood for delivery to International Paper for Forest Products’s quota.
Subsequent to this conversation in mid-June 1962, as the evidence shows without contradiction, Malcolm and his crew produced pulpwood exclusively for Forest Products until the last week in August, about two months later. Malcolm then entirely ceased his pulpwood operations since he became disabled by accidental injury.
The general pattern of operations described by Malcolm’s testimony is that he produced hardwood from the Duggan tract for about two days a week and then produced pine from the Sanders (and sometimes the Kelley) tract (s) on the remaining three work days of each week. One of the factual issues is whether Malcolm’s operations on the Duggan tract were as extensive as he claims.
Forest Products’s president George was somewhat equivocal in his testimony, but the evidence without essential dispute shows that George had made arrangements with Mrs. Ada Duggan to purchase the standing hardwood timber on her family’s tracts sometime prior to his directing Malcolm to cut such timber. Therefore, when working on the Duggan tract, under the jurisprudence earlier cited Malcolm was clearly a subcontractor or employee of Forest Products in processing the timber *165 previously purchased by the latter for processing' as pulpwood to fill its work order from International Paper.
The trial court held that, since Malcolm was initially employed as a subcontractor to cut the hardwood from the Duggan tract upon which he continued to work intermittently, the transfer of his operations alternatively to the Sanders tract (the timber upon which had been bought by himself rather than by Forest Products) did not change his relationship from subcontractor to mere seller, at least without any clear understanding that such change of status was to result whenever Malcolm left the Duggan tract to work upon other tracts for the same ultimate purpose, i. e., to produce pulpwood to fill the Forest Products’s wood order from International Paper. In so holding, the trial court relied upon Vinzant v. L. L. Brewton Pulpwood Co., 239 La. 95, 118 So.2d 117.
In the Vinzant case, the injured plaintiff had been employed on and off for some four or five years by the defendant Brew-ton. Shortly before the accident the plaintiff had been cutting timber owned by Brewton. Some two or three days prior to the accident, due to bad weather, he had transferred his operation to another tract. In finding that the employer-employee relationship persisted despite the plaintiff’s temporary transfer of operations to produce pulpwood from timber not owned by his employer, the Supreme Court stated, 118 So.2d 120, “ * * * Where one is employed by another over a period of time to do certain work, he has a right to presume that the same relationship continues when he does additional work of the same character, unless it is made clear to him that there will be a new relationship.”
With some reluctance we have determined that in the present circumstances our trial brother erred holding here applicable the principle of Vinzant v. L. L. Brewton Pulpwood Co.
Under the present facts, the agreement between Forest Products and Malcolm did not under our decision in Bryant v. U. S. Fidelity & Guaranty Co., 163 So.2d 95 constitute a continuing relationship by which Malcolm produced wood as subcontractor for Forest Products. Malcolm did enjoy such status when producing pulpwood from the Duggan tract(s), to which Forest Products had purchased the timber rights. Under Bryant, however, this circumstance does not by itself indicate any express or implied agreement that Malcolm remained a subcontractor instead of being a seller when he produced other pulpwood for Forest Products from timber which he himself rather than Forest Products had purchased from the landowner.
We conclude that, under our holding in Bryant, Malcolm was merely a seller to Forest Products when processing into pulpwood the timber which he himself had purchased. The holding in Vinzant v. L. L. Brewton Pulpwood Co. is not applicable in our opinion where there was no initial agreement or a continuing relationship indicating that Malcolm’s services were to be performed principally as subcontractor or employee, so that a temporary or incidental change of work location did not alter the essential or principal relationship between him and Forest Products in the absence of express understanding to such effect.
At this point, we may for the benefit of any further review discuss the contention of Forest Products that Malcolm had actually produced only 5.66 cords of pulpwood from the Duggan tract (s). This contention is chiefly based upon the only settlement sheet between Forest Products and Malcolm produced in evidence, dated June 29, 1962. See Exhibit 6, Tr. 52. (This sheet actually shows that three loads of hardwood total-ling 8.31 cords were so produced from the Duggan tracts, although the landowner was paid for only 5.66 cords.)
However, the settlement sheets produced in evidence by Forest Products in response *166 to a subpoena, see Exhibit D-l at Tr. 46, clearly do not include all of Malcolm’s deliveries of hardwood for Forest Products. Cf. Tr. 232-235, 455-456. For instance, the first two of these sheets, dated June 22nd and 26th respectively, show the delivery of pine, but the evidence is uncon-tradicted that Malcolm’s first deliveries for Forest Products were of hardwood from the Duggan tract.
Whether or not the landowners were paid the stumpage to which they were entitled, see Tr. 687, the preponderance of the evidence indicates that Malcolm and his crew cut hardwood on the Duggan tract on the Thursday they went to work for Forest Products, hauling one load the following day (Friday June 15th), and that they cut and hauled some six more loads on two days of each of the following two or three weeks.[7] One such subsequent week’s hauling is indicated by the settlement sheet dated June 29th. Exhibit 6, Tr. 52. Another week’s hauling on July 1st or 3rd is proved by the testimony of Mrs. Ada Dug-gan. She was absent in Mississippi during the latter part of June, and upon her return on July 1st she subsequently saw Malcolm and his crew cutting on the place, Tr. 683. The testimony of Malcolm and his crew members is positive that from mid-June to early July 1962 on about two days per week they cut and hauled a total of six or seven loads of hardwood from the Duggan tracts,[8] and this testimony is corroborated by the above circumstances.
Following the last or July 3rd delivery [9], Malcolm thereafter produced pine from the Sanders tract through the accident suffered by Monroe on July 26th, some three weeks later. Monroe was employed by Malcolm and then became injured while working during this period. However, after Monroe’s injury, Malcolm later returned to the Duggan tract in the latter part of August when he cut two or three loads of hardwood; these were never hauled to International Paper because of the termination of Malcolm’s operations due to his disability. Tr. 431-432. Mrs. Ada Duggan likewise testified that Malcolm had cut some timber on the Duggan tract which is still on the ground and which Forest Products has failed to come for despite her telephone calls to its office. Tr. 678-679.
Thus the preponderance of the evidence essentially supports the trial court’s factual finding that Malcolm worked intermittently between the Duggan tract cutting hardwood and the Sanders tract cutting pine, in both instances under a prior arrangement each week with Forest Products to cut and produce respective amounts of pine or hardwood to deliver to the International Paper to fill a portion of the Forest Products wood order.
In our view, however, this circumstance by itself does not justify the application of the principle of Vinzant v. L. L. Brew-ton Co. and a presumption that the initial relationship of principal-subcontractor continued. As earlier stated, under the majority’s holding in Bryant the agreement between the producer and the broker may contemplate that the producer may be a subcontractor while processing timber purchased by the broker-principal but a seller while processing timber individually purchased by the producer (even though for *167 processing and sale to the account of the broker-purchaser).
For the reasons previously stated, therefore, we must disagree with the trial court’s determination that Forest Products and its insurer Southern Casualty are liable in compensation for an injury sustained by Malcolm’s employee when working on timber purchased by Malcolm himself. Accordingly, the judgment must be reversed insofar as holding Southern Casualty liable for compensation benefits. (Forest Products was not sued by the plaintiff.)
4. Third-Party demand by Malcolm against Forest Products and its compensation insurer, Southern Casualty.
Malcolm filed a third party demand against Forest Products and its insurer Southern Casualty alleging that such parties are legally and equitably estopped from denying that Malcolm and his crew were covered by workmen’s compensation insurance while producing pulpwood for the Forest Products quota, whether Malcolm was a vendor or subcontractor. The trial court dismissed this third-party demand, and Malcolm appeals this dismissal.
Before Malcolm commenced producing pulpwood for Forest Products, George, the president of Forest Products, is alleged by Malcolm to have stated that insurance coverage was to be provided by Forest Products. Malcolm testified that in reliance upon these representations he failed to secure compensation insurance protection. It is thus contended that Malcolm’s detrimental reliance upon such representations by George now estops Forest Products from denying compensation liability. Stevens v. Mitchell, 234 La. 977, 102 So.2d 237; Carpenter v. Madden, La.App. 2 Cir., 90 So.2d 508; Hano v. Kinchen, La.App. 1 Cir., 122 So.2d 889.
The trial court, however, did not accept the testimony of Malcolm and his employees, directly contradicted by George, as preponderantly proving that such representations were made. We find no error in this factual determination by the trial court.
At least by implication this finding represents an evaluation of credibility, which appellate courts do not disturb on review in the absence of manifest error. We find none here. The circumstances of the initial conversation, in which Malcolm desired to secure work for his crew after being out of work a week or ten days, somewhat negative Malcolm’s account of his interest in securing assurance of insurance protection before going to work for Forest Products, as does Malcolm’s failure to have obtained liability or other types of insurance for his own protection. Comparison of the pulpwood prices received by Malcolm from his previous broker (who deducted insurance premiums for insurance coverage) with those paid him by Forest Products likewise indicates that the net price paid Malcolm by Forest Products was more probably not intended to withhold part of Malcolm’s price for premiums for insurance protection.
The amount of the workmen’s compensation insurance premium paid to Southern Casualty by Forest Products was measured by the number of cords of pulpwood delivered by Malcolm and the other producers. However, this circumstance does not indicate that the price paid to Malcolm was intended to be the net less a deduction of insurance premiums. In rejecting somewhat similar contentions in Hadnot v. Southern Casualty Insurance Co., 166 So.2d 15, 18, we held that such a method used to compute the premium rate does not extend the compensation policy coverage beyond that imposed by law.
The trial court correctly dismissed Malcolm’s third-party demand against Forest Products and its insurer, Southern Casualty.
5. Disability.
Despite respective contentions of greater or less disability than found, on *168 the basis of the preponderance of the medical evidence and of the record as a whole, we find no error in the trial court’s finding of disability and award of compensation from the date of the accident, July 26, 1962, when a tree fell on Monroe, up to October 16, 1963, some fifteen months later. We see no need to repeat the detailed analysis of the medical evidence contained in the trial court’s opinion.

Decree.

For the foregoing reasons, the judgment of the District Court is affirmed insofar as it held Malcolm L. Foster liable for compensation and medical expenses to Lee Collier, on behalf of his minor son, Monroe Collier; but it is reversed insofar as it held Southern Casualty Insurance Company (the insurer of Foster Forest Products, Inc.) solidarily liable with Malcolm Foster for such award. In all other respects, the judgment appealed from is affirmed. The defendant Malcolm L. Foster is to pay all costs of the trial and appellate courts.
Affirmed in part; reversed in part.

. Monroe Collier.

. Malcolm Foster.

. Southern Casualty Insurance Company.

. Foster Forest Products, Inc.

. George Foster.

. In Iris dissent in Bryant, 163 So.2d 95 at 103, the writer has indicated his disagreement with the court’s majority on this point. Since writs of review were denied, the writer yields to the majority although personally adhering to the views expressed in the cited dissent.

. Each load of pulpwood contains about three cords. A pulpwood crew could normally cut 2-3 loads per work day.

. See testimony of Malcolm at: Tr. 170, 431-432, 450-453. 485-486; of R. Collier: Tr. 187, 194-195, 196; of Hick- , man: Tr. 248, 258, 263; of Clifton: Tr. 394, 400, 412-413. timber or else a delivery of another’s hardwood delivered at the same time as another load from Duggan property, see Tr. 733, comparing such testimony with Mrs. Ada Duggan’s testimony that at about this date she saw Malcolm’s crew working on the Duggan property, Tr. 683.

.See settlement sheet No. 2055 for hardwood, which either represented Duggan